UNITED STATES v. FIDELITY & DEPOSIT CO. OF MARYLAND.

(Circuit Court of Appeals, Second Circuit. April 13, 1915.)

No. 146.

1. PRINCIPAL AND SURETY ☞123—DISCHARGE OF SURETY—UNITED STATES.

During the military occupation of Cuba by the United States, the President by an order authorized the extension of the postal service over the island, and by virtue of such order the Postmaster General appointed a Director General of Posts for Cuba. The latter established a Bureau of Finance, appointed a chief thereof, and required him to give a bond. Such bond, given by defendant, named the Director General as the "employer," recited that it was executed on the faith of statements and declarations made by the employer, and that it should become void if the employer or his successor should fail to promptly notify defendant of the discovery of any act of the employé which could be made the basis of a claim under the bond, or if, after discovery of any such act, the employé should be

intrusted with money or property without notice to and the consent of defendant. At the time the bond was given the Director General knew that the employé had previously embezzled funds coming into his hands officially, and also knew of continuous embezzlements thereafter, but withheld such knowledge from defendant. *Held,* in an action by the United States on the bond, that, having designated the Director General as its agent to make the contract, plaintiff was bound by its terms, that the requirement of notice by the named employer was reasonable and proper, and that the violation of such requirement invalidated the bond.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. §§ 304–311; Dec. Dig. ☜123.]

2. PRINCIPAL AND SURETY ☜149—ACTION ON OFFICIAL BONDS—SPECIAL LIMITATION—WAIVER.

By the terms of the bond recovery thereon was conditioned on the bringing of suit within 12 months from the filing of a claim. Notice of claim was given, and within a year thereafter the principal in the bond, the Director General, and another having been arrested for trial in the criminal court of Cuba, the successor of the Director General wrote to defendant, suggesting that in view of the approaching trial matters respecting the bonds should be allowed to rest without prejudice to any preliminary formal steps, "so that at the end of the criminal trial issue may be joined without delay on the merits of the cases." To this defendant assented. *Held,* that by such assent defendant did not wholly waive the special limitation in the bond, but at most only consented to its extension, so that action might be brought "without delay" after the termination of the criminal trial, and that an action brought more than two years thereafter was barred.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. § 414; Dec. Dig. ☜149.]

In Error to the District Court of the United States for the Southern District of New York.

This cause comes here upon writ of error to review a judgment in favor of defendant in error, which was defendant below. A jury was duly waived, and the cause was tried before Judge Martin, who, besides making findings of fact and conclusions of law, wrote a full and careful opinion, which will be found in a note hereto and may be referred to for facts not hereinafter stated.

H. Snowden Marshall, U. S. Atty., of New York City (H. Harper, Asst. U. S. Atty., of New York City, of counsel), for the United States.

O'Brien, Boardman & Platt, of New York City (A. B. Boardman, Frank H. Platt, and Livingston Platt, all of New York City, of counsel), for defendant in error.

Before LACOMBE, COXE, and ROGERS, Circuit Judges.

LACOMBE, Circuit Judge. As stated in the opinion of the District Judge:

"The President of the United States, as Commander in Chief of the Army and Navy, on July 21, 1898, made an order authorizing the extension of the postal service over the island of Cuba, which had come into the military possession of the United States. By virtue of that order the Postmaster General made an order, December 21, 1898, appointing E. G. Rathbone Director General of the Posts of Cuba. Said Rathbone on January 7, 1899, established the Bureau of Finance, so called, in his department, and on January 11, 1899, assigned C. F. W. Neely to be chief of that bureau and required him to give a bond as such chief. This he did by procuring the bond in suit October 21,

1899. The premium was paid by William H. Reeves, Assistant Auditor of the Department of Posts for the island of Cuba, out of funds received from that postal service. During the life of the bond Neely embezzled from the postal funds of the island of Cuba an amount in excess of the amount of the bond and in excess of another bond not in suit."

Rathbone and Reeves were also embezzlers. The three men plundered the Cuban postal funds with free hands, assisting each other in their fraudulent enterprise. All three were tried and convicted in the Cuban courts. Of the many questions which have been presented and argued, we find it necessary to consider two only.

[1] 1. The bond was given by Neely as principal and defendant company as surety to "E. G. Rathbone, Director General of Posts of the Island of Cuba, or his successor, hereinafter called the 'employer.'" It recites that the employer has delivered to the company certain statements and declarations in writing relative to the duties and accounts of the employé, the manner of conducting the business of the employer, and other matters which, together with any other statements or declarations in writing made by the employer and required by or lodged with the company, do and shall constitute the basis of this contract, and proceeds:

"Now, therefore, in consideration of [the premium] and upon the faith of said statements and declarations of the said employer, as aforesaid, it is agreed that, subject to the provisions and conditions herein contained, which shall be conditions precedent to the right on the part of the employer to recover under this bond, the company shall reimbuse," etc.

The bond provides that it may be continued from year to year, at the option of the employer at the same or an agreed rate of premium; also that the employer shall immediately give the company notice of the discovery of any act which may be the basis of any claim under the contract. The bond also contains the following clause:

"That this bond will become void as to any claim for which the company is responsible hereunder to the employer, if the employer shall fail to notify the company of the discovery of any act which may be made the basis of any claim hereunder, immediately after it shall have come to the knowledge of the employer. And if, without previous notice to and consent of the company thereto, the employer has intrusted or shall intrust the employé with money, securities, or other personal property, after having discovered any act of dishonesty, or condones any act for which the company may be liable hereunder, or makes any settlement with the employé for any loss hereunder, this bond shall be null and void, and any willful misstatement or suppression of facts in any claim made hereunder renders this bond void from the beginning."

It appears that prior to the execution of the bond Neely had violated his trust as Chief of the Bureau of Finance of the Department of Posts of the island of Cuba by embezzling funds that came into his hands officially, and that this was known to Rathbone as Director of Posts at the time of the execution of the bond in suit, but all knowledge thereof was withheld from defendant by plaintiff until July 7, 1900; that the various embezzlements by Neely during the life of the bond were all known to Rathbone at or about the time of their occurrence, but were not made known to defendant at any time prior to October 27, 1900. We concur with Judge Martin in the conclusion that Rathbone's failure to give notice to defendant of Neely's embezzlements invali-

dated the bond. The plaintiff designated Rathbone as agent to make the contract in suit and became party to the agreement which named him as the "employer" and required him or his successor to give the prescribed notices. It sems unnecessary to add anything to Judge Martin's discussion of this branch of the case. The case of American Surety Co. v. Pauly, 170 U. S. 133, 18 Sup. Ct. 552, 42 L. Ed. 977, and the whole group of cases to the same effect cited on the brief, do not apply, because the language of this bond differs radically from that in the Pauly Case. It unmistakably provides that the Director of Posts is the one who is to make the required statements on behalf of the obligee. It would be most unjust to let the obligee benefit by the fraudulent acts of the very person it had selected and designated as its agent for the purpose of notifying the obligor of misconduct on the part of the person for whom it became surety.

[2] 2. According to the terms of the bond, it was a condition precedent to recovery that suit should be brought by the obligee within 12 months from the filing of a claim. This certainly was not an unreasonable provision. Notice of the claim was served on defendant October 27, 1900, more than 3 years before action was begun. Plaintiff contends that this condition was waived by defendant. As was stated before, a criminal prosecution of Neely was begun in the Cuban court. On August 16, 1901, the Director General wrote to defendant, suggesting that in view of the near approach of the criminal trial the parties should "agree to let matters rest as to the entire group of bonds until conclusion of that trial, on the condition and understanding that it be without prejudice to any preliminary formal steps, so that at the end of the criminal trial issue may be joined without delay on the merits of the cases." To this proposition defendant agreed on August 20, 1901. The criminal proceedings terminated June 17, 1902. This action was begun July 11, 1904. The language above quoted would seem to imply that it was contemplated that the action should be begun by service of the summons within the year stipulated by the contract, but that no further action should be taken and issue not joined until the end of the criminal trial. But it is not necessary to give it that construction. Nor even is it necessary to hold that it was intended to extend the one-year period by such additional time as the criminal trial might take—a reasonable and proper construction as it seems to us. Certainly it contemplated and expressly provided that, when the criminal trial was ended, this action should be promptly brought, so that "issue may be joined without delay."

The government relies on Lynchburg Cotton Mill Co. v. Travelers' Insurance Co., 149 Fed. 954, 79 C. C. A. 464, 9 L. R. A. (N. S.) 654, where the contract required the institution of suit within 30 days. The court said:

"The insurer had the right to insist on the enforcement of this special limitation, but upon departing therefrom, certainly in the *absence of express stipulation to the contrary*, what was done operated, not as a suspension of the clause, but a waiver thereof."

Here, however, there is an express stipulation which clearly indicates that what was agreed to was a suspension and not a waiver.

It is unnecessary to discuss any of the other defenses which are relied upon.

The decree is affirmed.

NOTE.—The following is the opinion of the District Court, by Martin, District Judge:

MARTIN, District Judge. This action was commenced by summons and complaint July 11, 1904, upon a bond given by C. F. W. Neely, as principal, and the defendant, as surety, to E. G. Rathbone, as Director General of the Posts of Cuba, and his successor, as the employer of Neely. Issues were duly joined. July 21, 1898, the President of the United States, as Commander in Chief of the Army and Navy, made an order authorizing the extension of the postal service over the territory of Cuba, which had come into the military possession of the United States. By virtue of that order the Postmaster General made an order, under date of December 21st of the same year, appointing E. G. Rathbone Director General of the Posts of Cuba. Said Rathbone on the 7th of January, 1899, established the Bureau of Finance, so called, in his department, and, on the 11th of the same January assigned said Neely to be chief of that bureau and required him to give a bond as such chief. This he did by procuring the bond in suit October 21, 1899. The premium was paid by William H. Reeves, Assistant Auditor of the Department of Posts for the island of Cuba, out of postal funds received from that postal service. During the life of the bond said Neely embezzled from the postal funds of the island of Cuba an amount in excess of the amount of the bond, and in excess of another bond, not in suit.

The defendant contends that "no recovery can be had on this bond because, according to its terms, it was a condition precedent to recovery that suit should be brought within 12 months from the filing of a claim, and that this action was not brought within that period." Upon this point I find that notice of this claim was served upon the defendant October 27, 1900, 3 years and 9 months before this action was brought. As bearing upon this question the plaintiff introduced a letter from M. C. Fosnes, Rathbone's successor as Director General of the Department of Posts of the island of Cuba, dated August 16, 1901, addressed to the president of the defendant company, which contained the following proposal: "In view of the defensive contention indicated in your letter of collusive relations between employer and employé, affecting primarily the integrity of the bond, and in view, further, of the near approach of the criminal trial in the case of Neely et al., we will agree to let matters rest as to the entire group of bonds until conclusion of that trial, on the condition and understanding that it be without prejudice as to any preliminary formal steps, so that at the end of the criminal trial issues may be joined without delay on the merits of the cases. We expect the criminal case to be reached in the Audiencia (trial court) some time next month, although the date is yet uncertain, and the proceedings may stretch on through October." Also a cablegram sent several days later asking for reply to this letter. The plaintiff next introduced a cablegram sent by the president of the defendant August 20, 1901, to said Fosnes in reply, of which the following is a copy: "I agree your proposition letter sixteenth. Warfield." Said Warfield was president of defendant company. Nothing further occurred until the commencement of this action. The criminal proceedings to which reference was had in said negotiations terminated June 17, 1902.

The contention of the government is that by this consent of delay until after the termination of the criminal proceedings in Cuba the defendant wholly waived the provision in the bond that any suits at law or proceedings in equity brought against the bond to recover any claim thereunder must be instituted and process served upon the company within 12 calendar months next after the first notice of said claim is filed with the company (notice of claim was served upon defendant October 27, 1900), so that no action need be brought within any fixed period; while the defendant contends that about 10 months of the 12 under the terms of the policy had elapsed when this agreement for delay was made, and that the balance of the one year would begin to run at the termination of said criminal proceedings, June 17, 1902; that action was

brought about 23 months after that date, and that the words "without delay" in the Fosnes letter would indicate that there was no waiver of the fixed period in which suit was to be brought.

I do not concur in the plaintiff's claim that there was a total waiver of time in which suit might be brought, nor in the defendant's contention that suit must be brought within the 2 months after the termination of the criminal proceedings in Cuba. I think the fair construction of this correspondence is that suit must be brought with promptitude after the termination of said criminal proceedings. The language "without delay" would clearly indicate that understanding between the parties. Nothing is said in the correspondence to the effect that "without delay" should be within 2 months thereafter; but the words "without delay" must be construed in view of the requirements of the contract and all the circumstances, one of which is that insurance departments compel all surety companies to carry reserves sufficient to cover outstanding claims. This is a general rule known to everybody. Was the bringing of this suit nearly 23 months after the termination of said criminal proceedings acting "without delay"? The contract limits the right of action to one year. No claim is made that such a contract works injustice or is against public policy; hence the language used in the letter above quoted, "without delay," should be construed with the original agreement in mind. The action must be brought with reasonable diligence. How can the words "without delay" be construed to extend the time more than a year after the termination of the suits referred to in said letter? No reasonable excuse for this extended delay is shown by the evidence. I cannot find from this evidence that the plaintiff acted "without delay" in bringing the suit. On the contrary, I find that there was unreasonable delay on the part of the plaintiff in the bringing of this suit.

It is insisted on the part of the government that the government cannot be barred by a statute of limitations and that this contract simply takes the place of a statute. Statutes of limitations rest upon the presumption of payment by the lapse of time. It has been held by the Supreme Court that a right of action once existing in the government of the United States cannot be barred by a state statute. United States v. Nashville, Chattanooga & St. Louis Railway Co., 118 U. S. 120, 6 Sup. Ct. 1006, 30 L. Ed. 81, and cases there cited. Under a limitation in a contract as to time in which an action may be brought, if the action is not commenced within that time, the presumption is that no right of action existed.

The defendant further contends that "the bond in suit was made to the Director General of Posts of the island of Cuba or his successor; the United States has no interest in the bond, has suffered no loss by Neely's alleged embezzlements, and has no cause of action on the bond." While the defendant does not contend that the bond ran to Rathbone individually, it does insist that it was to the Department of Posts of the island of Cuba, in which the United States has no pecuniary interest. The facts relating to this point I need not state in extenso, as they rest upon statutes relating to intervention on the part of the United States with the people of the island of Cuba and official documents and decisions, of which any court will take judicial notice.

I do not concur in this claim of the defendants. The premium for this bond was paid under the authority of the United States, as above stated, and was accepted by the defendants knowing from what source it came. While it is true that the government of the United States turned over to the island of Cuba, at the close of the term of intervention, the postal funds received during said time, as well as other revenue received, yet the government of the United States was in authority, and Rathbone and Neely were its appointees assisting in and conducting the affairs of the Cuban people, and were acting directly for and in behalf of the United States. The United States government had the authority to appoint these men and discharge them at pleasure. Contractual relations existed between them and the United States. They owed an honest duty to this government, and the failure to perform that duty was a violation of their contract with the government and of the trust imposed in them. The United States government had the right to procure fidelity bonds for its own protection and to secure a fair deal for the Cuban people. Whether this action seeks pecuniary gain for the government of the United

States, or whether the recovery is to be turned over to the island of Cuba, I do not deem of any special importance, notwithstanding the provisions of amnesty by the Cuban government as to crimes committed, during the period of intervention, by citizens of the United States. Said amnesty, in my opinion, does not forfeit civil rights. It simply pardons crimes committed during that period—is not a release of legal liability for embezzlement.

The defendant further contends that the "bond according to its conditions became void immediately after it was made and there could be no recovery on it, because the 'employer' had knowledge of Neely's embezzlements and failed to notify the defendant company thereof as required by the bond," and it further claims that the employer's failure to give prompt notice of the assured's frauds is a breach of the contract. I find, from the evidence, that prior to the execution of the bond Neely had violated his trust as chief of the Bureau of Finance, Department of Posts of the island of Cuba, by embezzling funds that came into his hands officially, which was known to Rathbone at the time of the execution of the bond, and that Neely, subsequent to the execution of the bond, embezzled funds that came into his hands officially from time to time during the life of the bond, and that Rathbone knew of those embezzlements; that these facts known to Rathbone were not communicated to the defendant or any of its agents, either at the time of the execution of the bond or thereafterwards; and the said William H. Reeves paid the premium on the bond in question, as above stated. I find that Reeves knew at that time that both Rathbone and Neely were appropriating to their own use funds that came into their hands officially, and that he did not make that fact known to the defendant at all; that Rathbone, Neely, and Reeves were all tried for embezzlement in the Audiencia (trial court) duly established in Cuba, and convicted for that offense.

The bond provides that "the employer shall immediately give the company notice in writing * * * of the discovery of any act which may be made the basis of any claim under the policy, and shall file with the company his itemized claim, at his own cost and expense, with full particulars thereof, duly sworn to, immediately thereafter, and upon the making of such claim the bond shall cease and terminate as regards any liability for any act of the employé committed subsequent to the discovery of such loss." I see in this provision nothing unreasonable or against public policy. A provision that the underwriter shall be promptly informed of any breach of the bond by the employé often affords the underwriter an opportunity to protect itself against loss. It may bring proceedings to arrest the embezzler and secure funds embezzled, or attach property before it is put beyond reach. It surely would afford an opportunity to have the employé removed from service and promptly stop all further stealing on his part; at least, further liability under the bond would then cease. Observe the language of the contract: "Shall immediately give the company notice, * * * shall file with the company his itemized claim, * * * and upon making such claim the bond shall cease."

In the case at bar the contract designates definitely that notice shall come from the employer. Rathbone or his successor is named as the employer. This is a reasonable provision, as the employer would be most likely to first detect embezzlement. The embezzlement occurred under Rathbone, not his successor. Rathbone's failure to give notice was clearly an intended violation of the provisions of this contract. When he was designated as agent to make this contract in suit, and to name the party who should give notice, and named himself or his successor, he was acting within the scope of his power and duty conferred on him by the government. Standing in that relation, his nonfeasance was the nonfeasance of the beneficiary; surely so as between man and man. Such conduct under ordinary contracts would constitute a fraud and invalidate the bond. The surety has the right to infer that the continuance of the employé in the service of his master is, in effect, an assertion that the master has no knowledge of any criminal conduct in the service of his servant. Where silence is sure to effect deceit, silence is culpable. "Neither in morals nor in law can an obligee stand by and knowingly allow an obligor to take a risk which the former knows the latter has no intention to assume." If a man knows that his servant has betrayed his trust, and he still holds him out as a trustworthy man, it is deceit.

In Franklin Bank v. Cooper, 36 Me. 179, the defendant had executed a bond as surety for the good conduct of the cashier of the bank. The bank officers failed to inform the surety that the cashier was a defaulter at the time when the bond was executed. There was a judgment for the defendant. In the opinion of the court this language is used: "The law should be regarded as at rest upon this subject, to the extent that it is the duty of a person taking a guaranty for the good conduct of an employé to disclose the past malpractices of such employé in the course of the business to which the guaranty relates, and that if such duty is not performed the instrument so taken is ipso facto invalid. The continuance of an agent in an employment is an act so expressive of trust and confidence that it is tantamount to an express declaration to that effect, and hence it must, under usual circumstance, have all the effect of a meditated fraud, if the person so retaining the agent can be permitted to disown the implications inevitably arising from his own conduct." See, also, Smith v. The Governor and Company of the Bank of Scotland, 1 Dow. 272; Phillips v. Foxhall, L. R. 7 Q. B., 666; United States Life Insurance Co.. etc., v. Salmon, 91 Hun, 535, 36 N. Y. Supp. 830; Howe Machine Co. v. Farrington, 82 N. Y. 121; Connecticut General Life Ins. Co. v. Chase, 72 Vt. 176, 47 Atl. 825, 53 L. R. A. 510. A large number of other cases may be cited in support of this doctrine, but it is so well settled that further citations are unnecessary.

Does the conspiracy of these three men to defraud affect the application of these principles of law to the case in hand? I think not. The failure of Rathbone to promptly notify the defendant of the first known act of embezzlement by Neely, in my opinion, was a violation of the plain terms of the contract. If the government seeks fidelity bonds for protection against its employés who may become thieves, it can doubtless get them by paying a sufficient sum therefor; but it should not stipulate for the giving of prompt notice, or name one of said employés as the person to give the notice, or make him its agent in executing the contract, as was done in this case. I see no reason why this contract should not be construed like any other. It does not present the question as to liability of the government for the omission or commission of acts of its servants or employés.

The learned Assistant District Attorney, Mr. Wemple, who very ably tried this case in behalf of the government, has cited several cases in support of the principle that the government of the United States is not bound "by any laches of their officers, however gross, in a suit brought by it as a sovereign government to enforce a public right or to assert a public interest." This rule of law is based upon the great principle of public policy and is applicable to all sovereign nations. It forbids that the public interests or public rights should be prejudiced by the negligence of its servants or agents. That principle applies to the interests and rights of the public that abide with the people of a sovereign nation; but if a sovereign nation should become a contracting party with some individual that contract would be construed like any other, according to the fair meaning of the language used. There are no rights or interests vested in the public until the government performs its contract. When the contract has been performed, and public interests or public rights have been established, neither malfeasance nor nonfeasance of public officers can affect those rights. If the plaintiff is to be construed as a party to this contract, it must be upon the theory that Rathbone was its duly constituted agent in making the contract. His acts and omissions were the acts and omissions of the plaintiff, and before any rights can accrue under the contract, or can become "public rights or public interests," the terms of the contract must be performed.

The government of the United States alone was responsible in the selection of these men, not only for the handling of these funds in the personal service of the island of Cuba, but for the making of this contract, and, as a contracting party, if such it was, it must see to it that the plain provisions of the contract are performed. This is no harsh doctrine and does not in any manner challenge the rights of a sovereignty. It is simply holding that a government—town, state, or nation—must stand or fall upon the terms of a contract entered into through its officers to whom are delegated contractual powers. This principle of law can work no harm to the government except as to this case, because, as I understand the practice, the government does not now accept

bonds for its protection against loss caused by official malfeasance containing provisions of this character.

It is unnecessary to discuss the other points raised in the case, for I hold: First, that the terms of the contract were not complied with and no rights accrued thereunder to the plaintiff; second, that there was unreasonable delay in bringing the suit.

Let judgment be entered for the defendant.